1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF TEXAS

3                            HOUSTON DIVISION

4    UNITED STATES OF AMERICA        §     CASE NO. 4:23-MJ-1417-1
                                      §     HOUSTON, TEXAS
5    VERSUS                          §     TUESDAY,
                                      §     JULY 18, 2023
6    ANDREW VENEGAS                  §     10:01 A.M. TO 11:28 A.M.

7            **PRELIMINARY EXAM AND DETENTION HEARING**

8              BEFORE THE HONORABLE CHRISTINA BRYAN
                  UNITED STATES MAGISTRATE JUDGE
9

10

11   APPEARANCES:                          SEE NEXT PAGE

12   ELECTRONIC RECORDING OFFICER:    G. CLAIR

13   CASE MANAGER:                     JASON MARCHAND

14

15

16

17

18

19

20                    TRANSCRIPTION SERVICE BY:

21            JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                   935 Eldridge Road, #144
22                   Sugar Land, TX 77478
                       281-277-5325
23             mary@judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.

1                              APPEARANCES:

2

3   FOR THE PLAINTIFF:              US ATTORNEY'S OFFICE
                                    Luis F. Batarse, Esq.
4                                   1000 Louisiana St., Ste. 2300
                                    Houston, TX  77002
5                                   713-567-9000

6

7   FOR THE DEFENDANT:             PAUL DOYLE & ASSOCIATES, PC
                                    Paul H. Doyle, Esq.
8                                   440 Louisiana St., Ste. 2300
                                    Houston, TX  77002
9                                   713-228-9200

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX

2

3   WITNESS:              Direct      Cross      Redirect      Recross

4   TANISHA CAMPBELL
      By Mr. Batarse      6,33        .           47           .
5     By Mr. Doyle          .         42          .            .

6   Voir dire
      By Mr. Doyle          .         29          .            .
7

8


9
    EXHIBITS:                  Offered           Admitted
10
    ALL EXHIBITS ORDERED SEALED
11
    GOVERNMENT'S SEALED EXHIBITS:
12  Ex. 1                        14                14
    Ex. 2                        23                23
13  Ex. 3                        26                26
    Ex. 7                        35                35
14

15

16

17

18

19

20

21

22

23

24

25

1        **HOUSTON, TEXAS; TUESDAY, JULY 18, 2023; 10:01 A.M.**

2        THE COURT:  The case is *United States of America*

3  *versus Andrew Venegas*.  We're set for preliminary and

4  detention hearing.  But before we do that, I need to give

5  the oral *Brady* order.

6        Under Rule 5(f), counsel for the United States is

7  ordered to comply with its disclosure obligations under

8  *Brady versus Maryland* and its progeny.  The failure to do so

9  may result in the dismissal of charges, exclusion of

10 evidence, adverse jury instructions, contempt proceedings,

11 and sanctions.

12       All right, counsel, are we all going forward with

13 the preliminary and detention hearing today?

14       MR. BATARSE:  Your Honor, good morning.  Luis

15 Batarse for the United States.  I had spoken to defense

16 yesterday.  I'm not sure if we're doing the PC hearing or

17 both.  But we're ready.

18       THE COURT:  All right.

19       MR. DOYLE:  We -- good morning, Your Honor.  Paul

20 Doyle and Trevor Sharon for Mr. Venegas.  We intend to waive

21 the probable cause hearing and just move --

22       THE COURT:  And just move forward with detention.

23       MR. DOYLE:  Correct.

24       THE COURT:  Okay.  Great.  Give me one moment to

25 get my computer up and running.

1          Mr. Batarse, if you want to go ahead and get your

2   witness on the stand while I'm doing this, we can --

3          MR. BATARSE:  Yes, Your Honor.

4          THE COURT:  -- swear the witness.

5          And the basis for your motion for detention is 31 --

6          MR. BATARSE:  It's a 3142(e)(3)(E).  It's a

7   presumption because it's a sexual exploitation of a child

8   case that no condition or combination of conditions can

9   assure -- reasonably assure the Defendant's appearance or

10  the safety of the community.

11         THE COURT:  So that's an enumerated offense so

12  it's under -- your motion's under 3142(f)(1).

13         MR. BATARSE:  It is under --

14         THE COURT:  F-1 and then the --

15         MR. BATARSE:  It's one of the "E," three, "E,"

16  Your Honor, I believe that --

17         THE COURT:  I think that's where the presumption

18  is.  But there -- the motions are either under 3142(f)(1) or

19  (f)(2); (f)(1) is --

20         MR. BATARSE:  Yes, it's (f)(1), Your Honor.

21         THE COURT:  -- for the enumerated offenses.

22         MR. BATARSE:  Yes, Your Honor.

23         THE COURT:  All right.

24         THE CLERK:  Ma'am, raise your right hand.

25         TANISHA CAMPBELL, GOVERNMENT'S WITNESS, SWORN

 1              THE COURT:  This extra security really slows me

 2    down.

 3              All right, Mr. Batarse, you may proceed.

 4              MR. BATARSE:  Yes, Your Honor.  United States

 5    calls FBI Special Agent Tanisha Campbell to testify.  I

 6    believe she's already been sworn in.  Just making sure that

 7    was on the record, Your Honor.

 8              THE COURT:  We did get that on the record,

 9    correct, Gabby?  All right, thank you.

10              MR. BATARSE:  Okay.

11                        DIRECT EXAMINATION

12    BY MR. BATARSE:

13    Q    Agent Campbell, can you please introduce yourself to

14    the Court?

15    A    My name is Tanisha Campbell.  I'm a special agent for

16    the FBI.

17    Q    And how long have you worked for FBI?

18    A    I've worked for the FBI for four years.

19    Q    Tell us a bit -- a little bit about your duties for

20    FBI, training, things like that.

21    A    As an FBI agent, my duties are to investigate crimes,

22    in particular probably for about a year and a half I worked

23    counterterrorism, and for the remainder of those years I've

24    been working violent crimes against children.

25    Q    So approximately how many years, two years?

1   A      Two years.

2   Q      Okay.  Tell us about some of your duties in your job

3   investigating violent crimes against children.

4   A      Some of my duties are checking various websites for

5   content that might involve child pornography, sending off

6   subpoenas to get information on different subscribers.  I

7   serve search warrants.  And I investigate numerous other

8   crimes that involve children, kidnappings, parental

9   kidnappings.

10  Q      Okay.  Do you also investigate sexual -- the offense of

11  sexual exploitation of children?

12  A      Yes.

13  Q      Is that also known as production of child pornography?

14  A      Yes.

15  Q      How about receipt, distribution, advertising,

16  possession, offenses like that?

17  A      Yes.

18  Q      Okay.  Regarding the current investigation, are you the

19  case agent in FBI Houston for the current Defendant?

20  A      Yes.

21  Q      And what's his name?

22  A      Andrew Venegas.

23  Q      Okay.  And how was this investigation brought to your

24  attention?

25  A      The investigation was brought to my attention by a law

1  enforcement officer in Virginia.  They were doing an ongoing

2  investigation on an online moniker known -- it's a Telegram

3  application.  The online moniker was known as Starkylol.

4  And later we discovered that that was the Defendant, Andrew

5  Venegas.

6  Q    Okay.  So the -- is the investigation is from another

7  FBI office?

8  A    Yes.

9  Q    Okay.  Is that other investigation ongoing?

10  A    Yes.

11  Q    And what -- was that investigation related to websites

12  that publish material that's been illicitly obtained?

13  A    Yes.

14  Q    Are there numerous websites that publish that type of

15  material?

16  A    Not numerous but in particular that one in particular

17  was producing numerous content.

18  Q    Okay.  So during the investigation, as you just

19  mentioned, FBI Virginia came across the moniker Starkylol.

20  A    Yes.

21  Q    And what is it that drew the attention of FBI to this

22  particular user?

23  A    This particular user that they saw was uploading

24  content that involved adults and minors and, you know,

25  pornography content, --

1  Q     Okay.

2  A     -- pornographic content, excuse me.

3  Q     All right.  And so when we're saying pornographic

4  content, are we just merely saying pornography or is there

5  another element of stealing or taking or extortion that's

6  going along with it as well?

7  A     That's correct.

8  Q     Can you explain that to the Court?

9  A     Yeah.  So there was material being stolen from these

10 women's social media pages and they were used to extort and

11 blackmail them for additional photographs or images,

12 photographs, images, or any type of videos.

13 Q     Okay.  You mentioned Telegram, correct?

14 A     Correct.

15 Q     What is Telegram?

16 A     So Telegram is a mobile application that you can use on

17 a mobile phone or a desktop.  You can also sync Telegram

18 with all other devices that you might have, tablets,

19 cellphones.  You could sync one account.  It's used

20 primarily for messages, videos, documents.  You can upload

21 documents.  You can also broadcast your own channel for over

22 200 and thousand subscribers so people can subscribe to you.

23 Q     Okay.  So you can create a channel as a user that other

24 people can observe.

25 A     Correct.

1  Q    Kind of like a Facebook wall, like people can read

2  what's on the channel.

3  A    Correct.

4  Q    Okay.  And are you able to select what's public and

5  what's private on Telegram?

6  A    Yes.

7  Q    Okay.  And what is one of the benefits of using an

8  application or program like Telegram?

9  A    A lot of these applications can be encrypted so that's

10  one of the benefits to it.

11  Q    Why would somebody care if an application, you know,

12  where you're publicly posting information is encrypted or

13  not?

14  A    Mainly because they don't want certain content to get

15  out or known it to come from their Telegram wall or

16  application.

17  Q    Okay.  So does -- so Telegram, specifically you

18  mentioned encrypted.  Does that make it more difficult for

19  law enforcement to determine who is maybe posting a

20  particular type of content?

21  A    Correct.

22  Q    Okay.  And the people who utilize these types of

23  programs are aware of such things generally, correct?

24  A    Correct.

25  Q    Okay.  When we're talking about -- so we're -- you

1  talked about Telegram.  And there's also websites that

2  publish material that has been obtained through extortion or

3  blackmail or some other means.

4  A    Yes.

5  Q    Okay.  So during the investigation did FBI review

6  content from these different places online?

7  A    Yes.

8  Q    Okay.  And you mentioned that they came across

9  Starkylol.

10  A   Correct.

11  Q   And I'm going to fast forward just so that there's no

12  confusion about what we're discussing.  Did FBI execute a

13  search warrant on the Defendant's residence last week?

14  A   Yes.

15  Q   And just to be clear for the record, do you see Andrew

16  Venegas sitting in the courtroom today?

17  A   Yes.

18  Q   Okay.  Could you please identify him by an article of

19  clothing that he's wearing?

20  A   He's wearing green.

21  Q   Green.

22          MR. BATARSE:  May the record reflect that the

23  agent has identified the Defendant?

24          THE COURT:  Yes, so noted.

25          MR. BATARSE:  Okay.

1  BY MR. BATARSE:

2  Q    And so last week did FBI execute a search warrant at

3  his residence?

4  A    Yes.

5  Q    And during the execution of the search warrant was a

6  phone located inside of the residence?

7  A    Yes.

8  Q    And was it determined that the phone belonged to this

9  Defendant?

10  A    Yes.

11  Q    Okay.  And while the FBI was present, were -- was that

12  phone receiving messages?

13  A    Yes, that's correct.

14  Q    Okay.  So without going into the phone, FBI agents were

15  able to see that it was receiving messages.

16  A    That's correct.

17  Q    Okay.  And did FBI in fact using an undercover account

18  send a message to the user Starkylol while they were in --

19  while FBI agents were present in the search warrant?

20  A    Yes.

21  Q    Okay.  And did that phone actually receive the message

22  that was sent?

23  A    Yes.

24  Q    Okay.  Also, in order to get the warrant, we won't go

25  into all the details, but did FBI do extensive digital

1  forensic digital investigation to link Starkylol, other

2  accounts to this particular Defendant, Andrew Venegas?

3  A    Yes.

4  Q    And that was corroborated by the execution of the

5  search warrant; is that correct?

6  A    That's correct.

7  Q    And were other electronic devices seized during that

8  search warrant?

9  A    Yes.

10 Q    One in particular, has that recently been -- is one of

11 them currently under review?

12 A    Yes.

13 Q    Did that one also contain material by Starkylol A-K-A

14 Andrew Venegas?

15 A    Yes.

16         MR. BATARSE:   Okay.  So I just want to clarify

17 that for the beginning.

18 Q    And is the investigation into this Defendant still

19 ongoing?

20 A    Yes.

21 Q    The electronic devices that were seized last week, have

22 they been completely reviewed yet?

23 A    No.

24 Q    Okay.  So more time is needed to do that.

25 A    Yes.

1  Q    Okay.  Let's talk -- go back to Starkylol.  During the

2  investigation into Starkylol, did FBI utilize an undercover

3  Telegram account to communicate with the Defendant?

4  A    Yes.

5        MR. BATARSE:  And I'm going to -- may I approach,

6  Your Honor?

7        THE COURT:  You may.

8  BY MR. BATARSE:

9  Q    I'm going to show you what's been marked as Government

10  Exhibit 1.  Do you recognize what this is?

11  A    Yes.

12  Q    Okay.  Tell the Court what this is.

13  A    So this is a screenshot of the Starkylol Telegram page

14  that belongs to Starkylol.  It shows the subscribers and it

15  also shows a link.

16  Q    Okay.  And then this page here, is this a post that's

17  on there?

18  A    Yes, that's correct.

19        MR. BATARSE:  Okay.  Your Honor, I tender

20  Government's Exhibit 1 to opposing counsel for any

21  objection.

22      (Pause)

23        MR. DOYLE:  No objection.

24        THE COURT:  All right.  Exhibit 1 is admitted.

25      (Government's Exhibit Number 1 was received in

1  evidence.)

2          MR. BATARSE:  Your Honor, United States intends to

3  enter certain screenshots.  Many of the screenshots have

4  illicit and material that should not be published for

5  purposes of the victims in the case and the ongoing

6  investigation.

7          So with -- the United States respectfully requests

8  that we will enter the exhibits into evidence for the

9  purposes of this hearing, and then either request to seal it

10 or remove the exhibits with us after the hearing's complete,

11 whatever is more amenable to the Court.

12         THE COURT:  I think that we should seal them so

13 that if there's any review of my decision, the record will

14 be there for --

15         MR. BATARSE:  Yes, Your Honor.

16         THE COURT:  -- the district judge.

17         MR. BATARSE:  Okay.  Yes, Your Honor.

18         I'm showing you what's marked --

19         THE COURT:  So just so we're clear, --

20         MR. BATARSE:  Yes.

21         THE COURT:  -- the -- all of the exhibits to this

22 detention hearing will be docketed as sealed exhibits.

23 Okay.  Thank you.

24         (All exhibits ordered sealed.)

25         MR. BATARSE:  Yes, Your Honor.  And move to admit

1   Government's Exhibit 1.  I don't know if that was entered,

2   Your Honor.

3            THE COURT:  Yes.  It's admitted.

4        (Government's Sealed Exhibit 1 received in evidence.)

5            MR. BATARSE:  Okay.  All right.

6   BY MR. BATARSE:

7   Q    Looking at Government's Exhibit 1, that's the Starkylol

8   screenshot from his account.

9        Yes.

10  Q    How many subscribers does he have?

11  A    Five thousand, nine hundred and thirty-one subscribers.

12  Q    And approximately when was this screenshot taken?

13  A    May of 2023.

14  Q    So, what, two months ago.

15  A    That's correct.

16  Q    Okay.  And how many photos have been posted?

17  A    Two hundred and twenty-seven photos.

18  Q    How many videos?

19  A    A hundred and fifty-two videos.

20  Q    Okay.  And then over here, what is this post that he's

21  got at the top of his channel?

22  A    So the post by Starkylol says:  Want to make a note

23  that all of the content I post aren't from trades or

24  anything found online.  All of the content is originally

25  mine and no one else's.  That's what makes my collection so

1  great.  And then there's a emoji with a smiley face.

2  Q    And then what's this other pin message that he has

3  here?

4  A    So there's a pin message that says:  Here is a backup

5  for this channel, and then there is a link.

6  Q    Okay.  And underneath that.

7  A    Disclaimer:  None of the girls I post have an OF.  I

8  target the more innocent and amateur girls.

9  Q    And what does O-F stand for?

10 A    For my eyes only.

11 Q    No, is that Only Fans?

12 A    Oh, Only Fans, yes.

13 Q    Is that a pornographic -- is that a website where

14 people can voluntarily post content?

15 A    That's correct.

16 Q    So he's saying that his content does not contain Only

17 Fans content, correct?

18 A    Right.

19 Q    Okay.  We mentioned during the investigation that FBI

20 communicated with him with an undercover account, correct?

21 A    Correct.

22 Q    And so if the Telegram channel is public, so let's say

23 you as a person observing the Telegram channel and you see

24 something publicly, are you able to directly message or

25 personally message the author of the channel?

1  A      You can, yes.

2  Q      And are those direct messages public or private?

3  A      Private.

4  Q      So did FBI privately message the Defendant at

5  Starkylol?

6  A      Yes.

7  Q      And did the Defendant offer to sell collections of

8  photographs that he had obtained?

9  A      Yes.

10 Q      Okay.  Can you read what the pricing is for the

11 photographs obtained?

12 A      So for the pricing, it says:  All college girls, $130.

13 All college and blackmail $155.  All college, blackmail, and

14 under 18 is $215.

15 Q      And what does it say under there?

16 A      Crypto only, no exceptions.  Previews are in my public

17 Telegram channel.  The channel link is in my profile bio.

18 No trades.  And then it gives photo sizes are 21 gigabytes,

19 29 gigabytes, and 31 gigabytes.

20 Q      Okay.  So to be clear, what it -- what Starkylol is

21 saying here appears to be that there is a public Telegram

22 channel which is a preview; is that correct?

23 A      That's correct.

24 Q      And then a user can privately communicate with him on

25 the Telegram channel, correct?

1   A    Correct.

2   Q    Which is encrypted, right?

3   A    Yes.

4   Q    And then transfer monies, specific amounts of monies,

5   to the Defendant via cryptocurrency.

6   A    That's correct.

7   Q    Why might somebody like to use cryptocurrency instead

8   of maybe Zelle or some other, you know, method of sharing

9   funds?

10  A    Cryptocurrency is a lot harder to track.

11  Q    Okay.  A lot -- is it a lot harder to trace where it

12  comes from and goes to?

13  A    Where it goes to, yes.

14  Q    Okay.  Have you had a chance to review the Telegram,

15  the public Telegram channel in this case?

16  A    Yes.

17  Q    Okay.  Based on what he's publishing on the public

18  Telegram channel, what's -- what is it really that he's

19  advertising?

20  A    So from advertising you see adult women and minors

21  aging from approximately 16 to 25 years of age.  You have

22  some that are completely nude.  You have some that are

23  engaged in oral penetration or just sexual acts in general.

24  Q    Okay.  Now, the way -- is this an extensive Telegram

25  channel; are there a lot of posts?

1    A    There's a lot of posts.

2    Q    Okay.  Is -- regarding the -- so it says in the excerpt

3    you just read about blackmail, explain what he means when he

4    says blackmail.

5    A    So what he means by blackmail is that he'll take the

6    pictures that he has and he'll show them to the girls and

7    say that if you don't produce more of these pictures, then I

8    will send it out to the girl's families or friends.

9    Q    Okay.  And you said pictures that he has.  Is he able

10   -- does he brag about being able to get -- to hack into

11   girls' accounts?

12   A    Yes.

13   Q    Okay.  And so when he's in these accounts, what kind of

14   -- are you familiar with Snapchat?

15   A    Yes.

16   Q    What is Snapchat?

17   A    So Snapchat is another application that can be used on

18   a mobile device.  It's free.  You can upload videos and

19   photographs to send to friends or whoever you make as your

20   friends.  You can also send messages on there also.

21   Q    Okay.  In order to get into a Snapchat account, do you

22   have to have a user name and a password?

23   A    Yes.

24   Q    Okay.  And are there certain areas in your Snapchat

25   account that -- is there called a for my eyes only folder?

1  A     Yes.

2  Q     What is that?

3  A     So for my eyes only is essentially what it says, is

4  that when you're the user of that Snapchat account, you can

5  take photographs, videos, and then you can put it only in

6  that and you should only have access to be able to see those

7  images or videos.

8  Q     Okay.  And throughout his posts on his public Telegram

9  channel, does he brag about being able to obtain files from

10 the for my eyes only file?

11 A     Yes.

12 Q     So that is not only past the user and password but it's

13 a separate folder within the user's account, correct?

14 A     That's correct.

15 Q     Okay.  So then the Defendant would obtain these

16 sensitive photos or these private photos of these girls and

17 then would communicate with them.  How would he communicate

18 with them the photos, how would he reach out to them?

19 A     He would reach out to them from various different phone

20 numbers.  But he would reach out to them.  And once he

21 reached out to them, he would show them their photographs,

22 and he would basically tell them that, you know, I would

23 like more of these particular photographs, and if you can't

24 provide those, then I'll send this photograph that he took

25 for the for my eyes only, I will take this particular

1  photograph and then I'll send it to friends and family.

2  Q    Okay.  So it initially involves the unauthorized access

3  to their account, correct?

4  A    Correct.

5  Q    And then it involves extorting them for original

6  content, correct?

7  A    Correct.

8  Q    Now, when the -- is he communicating with them like on

9  the phone talking to them or is this all through messaging?

10 A    All through messaging.

11 Q    Does he in fact post the messages on his Telegram

12 channel to see how the exploitation works?

13 A    Yes.

14 Q    And to verify that he in fact is obtaining these images

15 and videos through coercion.

16 A    Yes.

17 Q    Okay.  I want to show you what's been marked as

18 Government's Exhibit Number 2.

19         MR. BATARSE:  May I approach, Your Honor?

20         THE COURT:  You may.

21 BY MR. BATARSE:

22 Q    Is this another post on the Starkylol channel?

23 A    Yes.

24         MR. BATARSE:  Okay.  Tender to opposing counsel

25 for any objection.

1      (Pause)

2            MR. DOYLE:  No objection.

3            MR. BATARSE:  United States moves to enter

4  Government's Exhibit Number 2.

5            THE COURT:  Exhibit Number 2 is admitted.

6        (Government's Sealed Exhibit 2 received in evidence.)

7            MR. BATARSE:  Okay.

8  BY MR. BATARSE:

9  Q    Can you read one of the messages that was posted by

10 Starkylol on his Telegram channel?

11 A    It says, I want to make a note that all of the content

12 I post aren't from trades or anything found online.  All of

13 the content is originally mine and no one else's.  That's

14 what makes my collection so great.  There is emojis, smiley

15 face emojis.  If anyone wants to buy any of the girls I post

16 on here, message at Starkylol for their complete sets.

17 Q    Okay.  So then this is just a big advertisement for the

18 sets that he sells; is that right?

19 A    Yes.

20 Q    Okay.  On some of these posts, I'm going to show you

21 what's been marked as Government's Exhibit Number 3.  Did

22 the United States file a complaint in this case?

23 A    Yes.

24 Q    Okay.  And was that for the sexual exploitation of a

25 minor?

1  A    Yes.

2  Q    Okay.  I'm showing you what's been marked as

3  Government's Exhibit Number 3.  It's one, two, three, four,

4  five, six, seven, eight, nine, ten, it's ten pages; are you

5  familiar with what these screenshots or images depict?

6  A    Yes.

7  Q    And what is it?

8  A    So this is a screenshot of a minor victim that was

9  identified.  She's about approximately 16 years of age,

10  engaging -- and she's nude, she has videos of her

11  masturbating.  And she's being instructed to do this.

12  Q    Okay.  Is this -- is Government's Exhibit Number 3 a

13  combination of the Telegram posts and other content that was

14  either provided by the victim or provided on these websites

15  that were part of the investigation?

16  A    That's correct.

17  Q    I'm noticing on some of these images that there is a

18  watermark on images that are found on these websites.  What

19  is this watermark?

20  A    So the watermark, it says Telegram, and then it says at

21  Starkylol.

22  Q    What does this mean?

23  A    So a watermark is basically meaning that that

24  particular image is kind of from his page, so that watermark

25  is pretty much a stamp, like a stamp saying, hey, this is my

1  content.

2  Q    Well if someone's producing illegal content, why would

3  they stamp it that way?

4  A    Might want people to know that it's their content.

5  Q    Is this also a type of advertisement?

6  A    It is.

7  Q    Okay.  So these are screenshots of conversations

8  between the complainant and -- the minor victim and the

9  Defendant.

10  A    Yes.

11  Q    Okay.  And then at the very end here, are these

12  screenshots that were provided by the victim?

13  A    Yes.

14  Q    Was she in fact interviewed?

15  A    She was interviewed.

16  Q    And did she in fact confirm that she was 16 at the time

17  that the photos and videos were created?

18  A    She was.

19  Q    Did she explain why she created photos and images for

20  the Defendant?

21  A    She did.

22  Q    Why?

23  A    She did that because, again, she was told that if she

24  doesn't produce any of these videos or photographs, that the

25  Starkylol would then send the pictures out to her family and

 1  friends.

 2          MR. BATARSE:  The United States tenders

 3  Government's Exhibit 3 to opposing counsel for any

 4  objection.

 5      (Pause from 10:27 a.m. to 10:28 a.m.)

 6          MR. DOYLE:  No objection.

 7          THE COURT:  Exhibit 3 is admitted.

 8      (Government's Sealed Exhibit 3 received in evidence.)

 9          MR. BATARSE:  Okay.  United States moves -- oh,

10  thank -- Your Honor, may I have permission to publish to the

11  Court for the Court's review?

12          THE COURT:  Yes.  You can hand it to Mr. Marchand.

13          MR. BATARSE:  Yes, Your Honor.

14          THE COURT:  Thank you.  What is the page 17, all

15  the phone numbers, what are those?

16  BY MR. BATARSE:

17  Q   Agent Campbell, can you explain to the Court what all

18  those different phone numbers are on that screenshot?

19  A   Yes.  So all those phone numbers are different phone

20  numbers that he would utilize to -- Starkylol would utilize

21  to contact the different women.

22          THE COURT:  All right.  Mr. Marchand.

23  BY MR. BATARSE:

24  Q   Just for purposes of the record, in this exchange, did

25  he actually send her photographs from her account without

1  her permission?

2  A    Yes.

3  Q    Okay.  And then is he instructing her how to send the

4  videos and the images?

5  A    Yes.

6           MR. BATARSE:  And we won't go into detail, the

7  Court has already read it.

8  Q    And then here does he tell her that if she doesn't send

9  these, then he won't keep these pictures and videos secret?

10  A    Yes.

11  Q    Okay.  I'm going to show you what's been marked as

12  Government's Exhibit Number 4.  Do you recognize these

13  screenshots?

14  A    Yes.

15  Q    Okay.  And are these screenshots of another

16  conversation that the Defendant had with another victim?

17  A    That's correct.

18  Q    Is it clear whether or not this victim is over or under

19  the age of 18?

20  A    Not really.

21  Q    Okay.  Would you say it's a teenage girl?

22  A    I would say it's a teenage girl.

23  Q    Okay.  But not sure if it's -- if this is an

24  unidentified victim at this point, correct?

25  A    That's correct.

1  Q    Okay.  And this conversation, the screenshots of this

2  conversation, are these from another website that publishes

3  this type of material?

4  A    That's correct.

5  Q    And are these watermarked images again showing that

6  these came from Starkylol?

7  A    Yes.

8  Q    Okay.  And what do these messages indicate between

9  Starkylol and this particular user?

10 A    So this message indicates that Starkylol was

11 instructing this user to make videos.  He was telling her

12 how to do it.  And the victim was doing exactly what was

13 asked.

14 Q    Was it obvious -- is it obvious from some of the images

15 that the victim is doing this voluntarily or involuntarily?

16 A    She's doing it involuntarily.

17 Q    And what is that obvious?

18 A    Because in the photographs you can see her crying.

19 Q    Okay.  And does he in fact reference the fact that

20 she's crying in the messaging?

21 A    Yes.

22 Q    And does he continue to ask her to produce more

23 content?

24 A    Yes.

25            MR. BATARSE:  Okay.  At this time the United

1   States tenders Government's Exhibit Number 4 to opposing

2   counsel for any objection.

3          (Pause from 10:33 a.m. to 10:34 a.m.)

4          MR. DOYLE:  Judge, if I could just ask a couple

5   questions before -- of the agent before I make an objection

6   just to understand where -- I don't completely understand

7   where this is coming from.

8          THE COURT:  So you want to ask questions to

9   authenticate the --

10          MR. DOYLE:  To authenticate --

11          THE COURT:  -- exhibit.

12          MR. DOYLE:  -- the exhibit.

13          THE COURT:  All right.  I'll allow it.

14          MR. DOYLE:  Thank you.

15                    VOIR DIRE EXAMINATION

16   BY MR. DOYLE:

17   Q    Special Agent, you said that you obtained these images

18   from another website, correct?

19   A    That's correct.

20   Q    And which website is that?

21   A    So right now it's still an ongoing investigation so I'm

22   not --

23   Q    Okay.

24   A    -- able to disclose that.

25   Q    And this website, what affiliation does Mr. Venegas

1 | have with website?  Do you have any evidence that he owns

2 | this website?

3 | A    At this time it's still an ongoing investigation.

4 | Q    Okay.  And these watermarks, do you know who -- anybody

5 | could put any watermark on an image, correct?

6 | A    (No audible response.)

7 | Q    In other words, how do you know that -- how do you link

8 | these messages and this watermark?  Just because it puts his

9 | Starkylol on it, how do you know he did it or had anything

10 | to do with these images, --

11 | A    Just --

12 | Q    -- other than the watermark?

13 | A    Yes, sir.  Based off just law enforcement and us still

14 | doing our ongoing investigation, we're pretty much able to

15 | identify that it came from a Starkylol.

16 | Q    How are you identifying that?

17 | A    At this time I can't disclose that due to it being an

18 | ongoing investigation.

19 | Q    And --

20 |          MR. BATARSE:  If I can clarify that question for

21 | you so that way -- for the Record?

22 | BY MR. BATARSE:

23 | Q    On the publicly viewable Telegram account, the images

24 | that Starkylol is publishing on Telegram, are those images

25 | watermarked as well?

1   A     Those are.

2   Q     And is it the same watermark that appears on the images

3   that's on -- in Government's Exhibit Number 4?

4   A     Yes.

5           MR. BATARSE:  Okay.  Sorry.

6   BY MR. DOYLE:

7   Q     Other than it being the same watermark, you know on the

8   internet people copycat others, people say things that

9   aren't true.  Is there any way to know that somebody else

10  didn't put the watermark, his watermark on these images?  Do

11  you have any way to prove that one way or the other?

12  A     Not at this time, no.

13          MR. DOYLE:  Okay.  Judge, I'd object to the

14  admissibility.  Other -- I don't think that there's enough

15  evidence that would link him to this other than a watermark

16  from another website that we have no evidence he's

17  necessarily affiliated with.

18          THE COURT:  Response, Mr. Batarse.

19          MR. BATARSE:  Your Honor, the -- so two things.

20  Number one, the -- as she's testified on the record, that

21  the watermark is a way that these users are identifying the

22  content that they created, he's gone to great lengths on his

23  public advertising channel for Telegram to describe that he

24  has original content, that content is available not solely

25  on Telegram.

1          But as we discussed at the beginning of the

2    testimony, it's available in a variety of places online

3    where people seek this particular type of blackmail and

4    extortion material.

5          I mean, if the Court wishes, you know, we can set

6    this particular image aside and we have plenty more.  But it

7    is the same watermark that appears on the publicly viewable

8    sites.  And I can elicit testimony from the agent that, you

9    know, the images of the minor victim were obtained from the

10   publicly viewable Telegram channel and from these other

11   websites as well, and this minor -- in other words, this --

12         THE COURT:  All right.  The agent can testify

13   because she has the information to which she can testify.

14   There's an objection to the authenticity of the Exhibit 3 as

15   to whether or not --

16         MR. BATARSE:  Exhibit 4, Your Honor.

17         THE COURT:  Exhibit 4.

18         MR. BATARSE:  Yes, Your Honor.

19         THE COURT:  As to whether or not it's actually

20   from the Defendant's -- whether it's pictures that he

21   watermarked or someone else watermarked with his -- with

22   that same moniker.  So I'm going to -- I'm not going to

23   admit Exhibit Number 4 into evidence --

24         MR. BATARSE:  Yes, Your Honor.

25         THE COURT:  -- for today.

 1            MR. BATARSE:  Okay.

 2                     DIRECT EXAMINATION (RESUMED)

 3  BY MR. BATARSE:

 4  Q    Special Agent Campbell, throughout your review of the

 5  publicly viewable Telegram channel, were you able to observe

 6  that there are numerous women that are depicted?

 7  A    Yes.

 8  Q    And is it obvious that there -- some of the women are

 9  the victims are either under the age of 18 and over the age

10  of 18?

11  A    Yes.

12  Q    At this point in the investigation, how many minor

13  victims have been identified by FBI?

14  A    Two.

15  Q    Okay.  So the one that we just mentioned, which was the

16  minor victim that's alleged in the complaint, and there's

17  another minor victim as well.

18        Yes.

19  Q    And she's been positively identified.

20  A    Yes.

21  Q    She residing in another jurisdiction?

22  A    Yes.

23  Q    Okay.  Now, on the Telegram channel, so we already read

24  an excerpt that he's advertising underage girls; is that

25  correct?

1   A     That's correct.

2   Q     Okay.  So I'm going to show you what's been marked as

3   Government's Exhibit Number 7.  Are these some screenshots

4   of girls that are listed on this publicly viewable channel

5   that appear to be under the age of 18?

6   A     That's correct.

7   Q     Does one of the girls literally say -- actually say

8   literally 17 in one of the images?

9   A     Yes.

10  Q     What's marked as page 32 in here; --

11              THE DEFENDANT:  She's not 17.  She's --

12  Q     -- is that correct?

13  A     That's correct.

14  Q     And are all of these taken from his publicly viewable

15  account?

16  A     Yes.

17  Q     At this point has FBI been able to identify these

18  girls?

19  A     Not at this point.

20  Q     Okay.  And can you definitively testify that these

21  girls are under the age of 18?

22  A     No.

23  Q     But do they appear to be under the age of 18?

24  A     Yes.

25  Q     And is this all publicly posted on his Telegram

1  channel?

2  A    Yes.

3        MR. BATARSE:  Tender Government's Exhibit Number 7

4  for any objection.

5     (Pause)

6        MR. DOYLE:  No objection.

7        MR. BATARSE:  Your Honor, at this time United

8  States moves to admit Government's Exhibit Number 7 and

9  publish to the Court.

10       THE COURT:  Exhibit Number 7 is admitted.

11     (Government's Sealed Exhibit 7 received in evidence.)

12       There you go, Mr. Marchand.  Thank you.

13  BY MR. BATARSE:

14  Q    And for purposes of the record, are some of these

15  images in Government's Exhibit 7, are these girls in

16  cheerleading uniforms?

17  A    Yes.

18  Q    Okay.  And they appear to be clearly in high school.

19  A    Yes.

20  Q    And then we also have one where it depicts two girls

21  who appear to be under the age of 18 and says, and they were

22  sisters; is that correct?

23  A    That's correct.

24  Q    And is the next picture next to it, is that a girl

25  performing fellatio on a hairbrush?

1   A    Yes.

2   Q    How many views is that?

3   A    Four thousand and fifty-six.

4   Q    Okay.  And then are these all side-by-sides, there's

5   like a public image of the girl next to a nude image of the

6   girl; is that correct?

7   A    That's correct.

8   Q    Okay.  Throughout the account -- and this actually

9   appears to be maybe a homecoming picture.

10  A    Yes.

11  Q    Okay.  Throughout the Telegram channel, is that largely

12  the style of advertisement that he engages in, namely he

13  posts a publicly posted image of a girl from either one of

14  her social media accounts or maybe a professional profile

15  like LinkedIn, and then next to that he posts the nude or

16  explicit image?

17  A    Yes.

18  Q    And in fact in some of the posts on the publicly

19  viewable channel that is his advertisement, does he in fact

20  post the LinkedIn information of some of the girls that he

21  posting explicit images of?

22  A    That's correct.

23  Q    Now, does he redact those for the Telegram channel?

24  A    Yes.

25  Q    But in his private content, is that the lure of the

1  payment of the content that you get, the unredacted

2  information?

3  A    That's correct.

4  Q    So what could a user -- so let's say a purchaser of

5  this content, it's 29 gigs or 31 gigs of content, what could

6  a user do with the personal information of a young girl

7  namely, you know, personal profile and name, face, date of

8  birth, what could somebody do with that kind of information?

9  A    They could figure out where they work at, where they

10 live at, where they reside at, and they can try to confront

11 them, see where they work at, talk to them or try to harm

12 them if that's something that they wanted to do.

13 Q    Were there reports of other people trying to exploit

14 maybe the same individual?

15 A    Yes.

16 Q    Okay.  Regarding the undercover conversation that we

17 refer to at the beginning, did -- so law enforcement reached

18 out to Starkylol and he provided the pricing structure; is

19 that correct?

20 A    That's correct.

21 Q    Did undercover officers engage -- they transfer money

22 to Starkylol?

23 A    That's correct.

24 Q    And did they receive a link to the content that was

25 described?

1    A    That's correct.

2    Q    And did that content contain many of the -- much of the

3    content that's being described here?

4    A    Yes.

5    Q    Now, was the FBI able to get a complete copy of that

6    content?

7    A    No.

8    Q    Why not?

9    A    Because at some point it just stopped downloading.

10   Q    Okay.  But that link that was sent to FBI for FBI to

11   download, did FBI make a determination -- was that a remote

12   third party storage website that was being used to host the

13   information?

14   A    Yes.

15   Q    Did FBI make a request to that third party website to

16   determine how many times this -- the Defendant, the person

17   who had sent the link, had sent links to content?

18   A    Yes.

19   Q    Approximately how many times did that occur?

20   A    So that occurred about 1,924 times.

21   Q    Okay.  And just to be clear, we talked about that the

22   pricing is minimum 130 for college girls, then 155 for

23   college and blackmail, then 215 for college, blackmail, and

24   under 18; is that correct?

25   A    That's correct.

1       MR. BATARSE:  Okay.  And we're almost done.

2   BY MR. BATARSE:

3   Q    I'm going to show you in one fell swoop here

4   Government's Exhibits Number 8 through 13.

5       MR. BATARSE:  May I approach, Your Honor?

6       THE COURT:  You may.

7   BY MR. BATARSE:

8   Q    Are these also publicly viewable posts made by the

9   Defendant on his account?

10  A    Yes.

11  Q    Okay.  And do they appear to depict the same kind of

12  side-by-side images where, you know, one that was publicly

13  posted and then the private content?

14  A    That's correct.

15  Q    Okay.  And do these all have comments on them as well?

16  A    Yes.

17      MR. BATARSE:  Okay.  Tender Government's 8 through

18  13 to opposing counsel for any objection.

19      (Pause)

20      MR. DOYLE:  No objection.

21  BY MR. BATARSE:

22  Q    And for the record, on this post, can -- on

23  Government's Exhibit 8, what does he say at the bottom, what

24  does he post at the bottom?

25  A    It says, don't they know already?  Post a TikTok dance,

1  I see it, I go after you.

2  Q    And then Government's Exhibit Number 9, what are we

3  seeing here?

4  A    It says, secret content like this is only a small

5  percentage of what I have.

6  Q    Government's Exhibit Number 10.

7  A    They will do the most to not end up leaked.

8  Q    Is that -- on the left, is that a TikTok video?

9  A    That is.

10 Q    And on the right, is that an extremely graphic video of

11 the same individual?

12 A    Yes.

13 Q    What does that mean, they will do the most to not end

14 up leaked?

15 A    Basically meaning that that extortion mechanism that we

16 talked about before is that whenever he sends a photograph

17 of them and he asks for more photographs, if they do not do

18 it, then he will then say that I'm going to send this to

19 your family and friends, meaning that I'm going to leak

20 those photos out to the public so other people can see it.

21 Q    So he's saying that's just (indiscernible).

22 A    Yes.

23 Q    Okay.  And it's 7,020 views on that one.

24 A    That's correct.

25 Q    At the bottom, it says here -- what does it say?

TANISHA CAMPBELL - DIRECT BY MR. BATARSE                    41

1  A    If you can't tell, she had just been crying.

2        MR. BATARSE:  Okay.  At the -- that was

3  Government's Exhibit Number 11.

4  Q    Now Government's Exhibit Number 12, what does that say

5  on the bottom?

6  A    I bet you'll miss me making you send nudes and

7  fingering videos from your dorm.

8  Q    And Government's Number 13, what does that say?

9  A    Prom fuck videos -- I'm sorry, prom fuck vids are

10 always, and it has a fire emoji.

11 Q    Okay.  During the review of the Defendant's -- is one

12 of the electronic devices that was seized during the search

13 warrant, is that currently under review?

14 A    Yes.

15 Q    Were files located on that device that obviously

16 confirmed that the user of that computer is in fact Andrew

17 Venegas?

18 A    Yes.

19 Q    And at this point is FBI able to say that there are at

20 least 200 victims where there's images or videos that are

21 contained on that device?

22 A    That's correct.

23 Q    Is there likely more on there?

24 A    Likely, yes.

25 Q    But has FBI been able to complete their investigation?

TANISHA CAMPBELL - DIRECT BY MR. BATARSE                    42

1   A     Not at this time.

2   Q     Okay.  Roughly how long -- to FBI's knowledge, how long

3   has the Defendant been engaging in this -- on this online

4   activity?

5   A     About 2021.

6   Q     Until when?

7   A     Until July 11, 2023.

8   Q     And was that the execution of the search warrant?

9   A     Not the 11th.  I believe it was July 12th --

10  Q     Okay.

11  A     -- of 2023.

12  Q     So is that approximately two years?

13  A     Yes.

14  Q     Okay.  Regarding the Defendant under the moniker of

15  Starkylol, would -- compared to other producers of content,

16  is this Defendant considered a prolific producer or a

17  regular producer?

18  A     A prolific.

19          MR. BATARSE:  Okay.  Pass the witness, Your Honor.

20          THE COURT:  Thank you, Mr. Batarse.

21          Mr. Doyle.

22          MR. DOYLE:  Thank you, Your Honor.

23                    CROSS-EXAMINATION

24  BY MR. DOYLE:

25  Q     Special Agent Campbell, correct me if I'm wrong, if I'm

1   hearing this right.  There are two known victims right now.

2   A    Yes.

3   Q    And based on your information with these two known

4   victims, you know how these photos were originated and came

5   into possession of Starkylol, right?

6   A    Say it one more time.

7   Q    Based on your investigation and conversations with the

8   two known victims, those photos, you know how they ended up

9   with Starkylol's account, correct?

10  A    Which photos are you referring to?

11  Q    The photos that were just published.  One of them --

12  there's one known victim, right, who resides here.

13  A    Yes.

14  Q    Correct?

15  A    Yes.

16  Q    But -- and I guess my point is, all of these other

17  images, you don't know how they were -- they ended up on

18  that Telegram account, correct?

19  A    Do I not know how they ended up?

20  Q    Well you don't know if they were consensually sent, you

21  don't know if they were taken from someone else's Telegram

22  account.  You don't have the background on any of these

23  other images right now.

24  A    So based off of our investigation and interviews, there

25  was interviews saying that.  And if you look at the

1  screenshots, those videos that we're seeing, there's

2  instruction on what needs to be done.  And the girls are

3  doing those instructions in the videos or images.

4  Q    But you don't know what the relationship is with the

5  girl.  You don't know who gave the instructions.  You just

6  know there's an image on his Telegram account, correct?

7  A    The instructions came from like I said different phone

8  numbers believed to be Starkylol.  And a lot of those

9  females, that's what they talked about.

10 Q    Okay.  Well, let me -- when you executed the search

11 warrant, you went to the residence of Mr. Venegas, correct?

12 A    Yes.

13 Q    And in that residence his parents also live there,

14 correct?

15 A    Yes.

16 Q    If you could tell the Court whether or not the parents

17 were cooperative with you.

18 A    Absolutely they were.

19 Q    Did they provide you their cellphones and let you look

20 into on their devices?

21 A    Yes.

22 Q    Did you find anything inappropriate on their devices?

23 A    Not for dad.  So I only saw dad's.  I didn't see mom's.

24 But for dad I did not.

25 Q    Did you ask the mom for her phone?

1  A     Another agent did.

2  Q     Did she provide it?

3  A     I believe so, yes.

4  Q     Did everything that was asked --

5  A     Yes.

6  Q     -- from the Government --

7  A     Yes.

8  Q     -- to them.  And before you executed the search

9  warrant, I assume you did a background check on Mr. Venegas.

10 A     Yes.

11 Q     Does he have any criminal history?

12 A     No.

13 Q     Throughout this extensive investigation, do you have

14 any evidence that Mr. Venegas ever touched a child,

15 solicited a child to his house to make physical contact?

16 A     Not to my knowledge.

17 Q     And if the Court were to remove internet privileges to

18 Mr. Venegas, he would not be a threat; would you agree with

19 me?

20 A     I do not agree with that.

21 Q     All of his -- all the activities you're describing to

22 the Court came from behind a keyboard or a mobile device,

23 correct?

24 A     That's correct, to our knowledge.

25 Q     So if internet was -- if he did not have access to

1   internet, okay, he could not be a threat, correct?

2   A    That's not true.

3   Q    Don't you have to have internet to engage in this kind

4   of conduct?

5   A    So the issue right now is that the images are already

6   out there.  So with these images or videos being out there,

7   that doesn't stop a child from maybe wanting to commit

8   suicide because they're ashamed of things that have been put

9   on there, and they might go through other psychological

10  issues that they might have.

11          MR. DOYLE:  I'm going to object to nonresponsive.

12  The --

13          THE COURT:  She answered the question.  But let's

14  move on.  I mean, --

15          MR. DOYLE:  Okay.

16          THE COURT:  -- I understand what your --

17          MR. DOYLE:  Okay.

18          THE COURT:  -- questioning is getting at.  And --

19          MR. DOYLE:  Okay.

20          THE COURT:  -- I understand her answer.  If you

21  want to ask her -- I think the question is direct in terms

22  of what's relevant to this detention hearing.

23          If the Defendant has no access to internet, do you

24  have any evidence to show that he poses a danger to the

25  community or specific individuals without being able to use

1  the internet?

2           THE WITNESS:  No.

3           THE COURT:  All right.

4           MR. DOYLE:  No further questions, Your Honor.

5           THE COURT:  All right.  Any Redirect?

6           MR. BATARSE:  Yes, Your Honor.

7           THE COURT:  Okay.

8           MR. BATARSE:  On those issues.

9                   REDIRECT EXAMINATION

10 BY MR. BATARSE:

11 Q    Let's talk about the internet privileges.  Is it really

12 possible to prevent someone from having access to the

13 internet?

14 A    No.

15 Q    And was the Defendant utilizing a mobile device?

16 A    Yes.

17 Q    In addition to his desktop computer.

18 A    That's correct.

19 Q    Okay.  And regarding the cooperation, absolutely the

20 parents were cooperative.  Was the Defendant informed that

21 the warrant for his residence also included a warrant to

22 search his person?

23 A    It was.

24 Q    And was he also informed that the warrant authorized

25 obtaining biometric data in order to unlock his phone?

1  A      That's correct.

2  Q      And did he intentionally not cooperate and allow the

3  Government to execute that search warrant?

4  A      That's correct.

5  Q      After multiple times of requests.

6  A      That's correct.

7  Q      And he was uncooperative with that mandated request --

8  authorization from the warrant; is that correct?

9  A      That's correct.

10 Q      Which was specifically articulated to him multiple

11 times.

12 A      That's correct.

13 Q      Okay.  And regarding the mobile device, his parents

14 obviously are cooperative.  The Defendant lives in his

15 parents' house, correct?

16 A      That's correct.

17 Q      He has been doing this for two years at least that

18 we're aware of, correct?

19 A      That's correct.

20 Q      In their home; is that correct?

21 A      Yes.

22 Q      Is it a mobile device, a phone, how big is a phone?

23 A      It's not that big.  It's pretty small.

24 Q      Can you purchase a phone at a Walmart?

25 A      You can.

1  Q     Can you purchase a phone pretty much anywhere that

2  people sell things?

3  A     Yes.

4  Q     Is it reasonable or conceivable that you can limit

5  internet to a particular person if they have access to a

6  device?

7  A     Yes.

8  Q     Yes or no, can you limit the internet access that

9  someone can have?

10  A     No.

11  Q     Okay.

12          THE COURT:  Wait.

13  Q     I also want to --

14          THE COURT:  Hold on.

15          MR. BATARSE:  Yes, Your Honor.

16          THE COURT:  I understand you can purchase a phone.

17  But if you want to have a phone that accesses the internet,

18  you've got to have an account, you've got to have some

19  internet access.  I mean, you have to have -- just

20  purchasing a phone that can be used as a telephone doesn't

21  mean it's a smartphone that can access the internet,

22  correct?

23          MR. BATARSE:  There's a difference between a data

24  plan and being able to access Wi-Fi.  I mean, so what we're

25  dealing with is if you have a mobile device, yes, you need

 1  the -- an internet plan if you want mobile access to -- and

 2  I can ask questions regarding this.

 3         But with regard to accessing Wi-Fi, for instances,

 4  that's readily available.  I mean, you know, you can't -- we

 5  can have that discussion during argument, but I can clarify

 6  this through the witness testimony.

 7  BY MR. BATARSE:

 8  Q    The Honorable Court can't restrict other people from

 9  having access to Wi-Fi, and the nature of Wi-Fi is --

10         THE COURT:  Are you talking about in their home?

11  I can restrict people's access to the internet in their

12  home.

13         MR. BATARSE:  Sure.  But there's neighboring

14  homes, you know, and then, you know, phone devices.  There's

15  ways that a person can obtain access to Wi-Fi that doesn't

16  merely require mobile access.

17         And I would venture to guess that the access that

18  was being used on the mobile device was probably Wi-Fi

19  access.

20         And so the answer is it's both yes and no.  I

21  mean, you can also get, you know, prepaid plans which have

22  mobile access so that you would have mobile internet without

23  the consent or knowledge.

24         So, you know, it's -- the United States doesn't

25  believe -- and if the Court wishes, I can obtain testimony

1  regarding this.  But the issue here is that the Court is

2  correct to say that a large portion of the threat that the

3  Defendant has presented and continues to present is his

4  ability to access the internet.

5           But in this instance, a person who's capable of

6  hacking into girls' accounts over and over and over again, a

7  person who's been able to -- you know, the sophistication of

8  hiding behind all these different manners and doing it all

9  under the nose of his family who -- with whom he would, you

10 know, if he were released would still be living with, it

11 just seems under these particular circumstances you have a

12 -- you've got a lopsided level of skill and a desire to

13 engage in such activity.

14           THE COURT:  All right.  Any other questions for

15 this witness?

16           MR. BATARSE:  Yes, Your Honor.

17 BY MR. BATARSE:

18 Q    Regarding some of the questions about how do you know,

19 was it communicated to you by the office that the agents who

20 are reviewing the device, were there screen recordings on

21 the -- one of the electronic devices that was obtained at

22 his home?

23 A    Yes.

24 Q    And do those screen recordings show him entering

25 without access to girls' accounts?

1  A     They do.

2  Q     So it actually records his screen doing that.

3  A     Yes.

4  Q     And at various times are there actual images of this

5  Defendant, this person sitting here actually being the

6  person behind the screen?

7  A     Yes.

8  Q     And did law enforcement find a list of Snapchat

9  usernames and passwords on his device?

10 A     Yes.

11 Q     Was that a long list?

12 A     It was a long list.

13 Q     Okay.  Was that in the hundreds?

14 A     Yes.

15         MR. BATARSE:  I think that's all the questions in

16 response.

17         THE COURT:  All right.  Thank you, Mr. Batarse.

18         MR. BATARSE:  Yes, Your Honor.

19         THE COURT:  Any other cross-examination?

20         MR. DOYLE:  No, Your Honor.

21         THE COURT:  All right.  You may step down, Agent

22 Campbell.

23      (Witness steps down.)

24         Any other witnesses for the Government?

25         MR. BATARSE:  No, Your Honor.

1              THE COURT:  Do you have any witnesses to call?

2              MR. DOYLE:  I just would like to proffer for Maria

3    Venegas, Mr. Venegas's mother, who he would live with if he

4    were out on bond.  She would testify that she would follow

5    any instructions that the Court sets, any restrictions that

6    the Court sets, they -- that she would be there to supervise

7    them.  Now that they're aware of these allegations, they

8    will make sure and follow any -- that he follows it, they

9    will maintain custody of him and do whatever the Court

10   instructs.

11             And then on behalf of Armando Venegas, his father,

12   who is currently not employed now, who can supervise him

13   around the clock and make sure to do whatever the Court

14   requests of him if the Court releases him on bond, they will

15   comply with everything that the Court asks of them.

16             And, Judge, we'd also just like to -- I think you

17   have it but just offer the pretrial report.

18             THE COURT:  I've read it.

19             MR. DOYLE:  Okay.  That's all from the defense,

20   Your Honor.

21             THE COURT:  All right.  I don't really need a

22   whole lot in terms of argument.

23             Well, first of all, let me get on the record that

24   we were scheduled for a preliminary and detention hearing.

25   At the start of this hearing, the Defendant waived or passed

1   the preliminary portion of the hearing; is that correct?

2          MR. DOYLE:  That's correct, Your Honor.

3          THE COURT:  So there's no contest to probable

4   cause at this point.

5          MR. DOYLE:  That's correct, Your Honor.

6          THE COURT:  All right.  So probable cause finding

7   has been made.

8          All right.  I don't need a lot of argument but I

9   would like to focus on the -- I would like more information

10  on a few issues.  First of all, what is this Defendant's

11  job?  What is a commission specialist?  I know where he

12  works but what does he do?  Does he have to have a computer

13  to do it, etcetera?

14         MR. DOYLE:  He's a data analyst and he has a work

15  computer that he would need access to to input the data.

16  But he could get another job, Your Honor.  If a computer's

17  required, he can go find another job that does not require a

18  computer.

19         THE COURT:  And where does his mother work?

20         Ma'am, can you stand up, please?  Where do you

21  work?

22         MS. VENEGAS:  I work at (indiscernible).

23         THE COURT:  And what are your hours?

24         MS. VENEGAS:  My hours vary because I'm in sales.

25         THE COURT:  Well get -- can you give me general

1    hours?  Do you work from home or do you work --

2          MS. VENEGAS:  Eight to 5:00.

3          THE COURT:  Do you work in an office?

4          MS. VENEGAS:  Yes.

5          THE COURT:  Generally 9:00 to 5:00.

6          MS. VENEGAS:  Yes.

7          THE COURT:  Do you need to have internet at home

8    for your work?

9          MS. VENEGAS:  Not necessarily because I have my

10   office and I have -- my office where I have internet.

11         THE COURT:  And does your husband need to have

12   internet at home?

13         MS. VENEGAS:  No.

14         THE COURT:  What about your other child who lives

15   at home?

16         MS. VENEGAS:  No.  My other son is in college, not

17   home yet.

18         THE COURT:  Not home yet.  Is he coming home for

19   the summer?

20         MS. VENEGAS:  More than likely.

21         THE COURT:  Okay.  But he does not have to have

22   internet at the house.

23         MS. VENEGAS:  No, ma'am.

24         THE COURT:  All right.  Anything else from the

25   Defendant to proffer?

1          MR. DOYLE:  No, Your Honor.

2          THE COURT:  All right.  I'm ready for argument.

3          MR. BATARSE:  Your Honor, under 3142(g), the

4   factors that are required for the Court to consider, as the

5   Court is aware, the nature and the circumstances of the

6   offense charged, including whether the offense is --

7   involves a minor victim.

8          There's been lots of evidence before the Court

9   obviously of at least two minor victims and potentially more

10  victims who have yet to be unidentified.

11         This is a presumption case for a reason.  The

12  Defendant is not only a danger to adult young females but

13  also to minor victims as well.  So 3142(g)(1) weighs heavily

14  against the Defendant; (g)(2), the weight of the evidence

15  against a person is extremely extensive.  I won't go into

16  detail.  The Court has heard all of the evidence.

17         The nature and seriousness of the danger, which is

18  section four, to any person or the community that would be

19  posed by the person's release.

20         Your Honor, as the Court has accurately

21  identified, in practice trying to limit a person's access to

22  the internet is in practice impossible, particularly if

23  someone is going to be living in a residential neighborhood

24  or possibly working.

25         I'm -- I -- the Defendant's current job, which is

1   the evidence that's before the Court, involves data

2   analysis, and that's going to involve computers.  Most any

3   job that somebody would work in if they were released would

4   involve computers.

5            Any phone can also be utilized as a hot spot so it

6   doesn't necessarily just have to be a fixed modem or a fixed

7   router.

8            The idea that, you know, that United States or

9   this Court would be able to set conditions that would

10  totally prohibit this person from accessing the internet is

11  not reasonable under the circumstances, particularly given

12  the type of offense that we're dealing with where the

13  Defendant has been able to conceal his identity.

14           None of these victims -- there's testimony before

15  this Court is that the Defendant has been utilizing an alias

16  this entire time in order to effectuate the crimes that he's

17  been doing against all of these victims.  And to be clear,

18  we're talking about hundreds of people.

19           And whether or not they're minors, this is all

20  extortion, this is blackmail, this is, you know, these are

21  -- whether or not they're under the age of 18, these are

22  still people that he is taking advantage of.

23           And the reach that he has had has been extremely

24  extensive.  I mean, this -- there is no limitation.

25           So the question before the Court is, it's not, you

1    know, is there -- is it hypothetically possible.  But given

2    the circumstances as it presents itself, mainly that he's

3    been living in this same place for this amount of time,

4    committing these crimes here and, you know, the Defendant

5    does have other siblings, neighbors, you know, presumably

6    would have access to the world, it just seems that there

7    isn't a reasonable way to ensure the safety of the community

8    by merely restricting his internet access in one way or the

9    other.

10            And so for these reasons the United States

11   believes that the presumption still applies to this

12   Defendant and that there is not a set of conditions or --

13   that this Court can impose that can reasonably assure the

14   community that further victims will not be victimized.

15            THE COURT:  Thank you, Mr. Batarse.

16            Mr. Doyle.

17            MR. DOYLE:  Thank you, Your Honor.  I believe the

18   presumption's been rebutted.  It's -- the Government's

19   argument is more towards the weight and not towards

20   conditions that would assure his appearance and not to be a

21   danger.

22            He has strong family ties.  His parents are

23   obviously aware of these allegations and are prepared to

24   follow whatever conditions the Court sets.

25            He doesn't have criminal history.  He's low risk.

1          You can put a GPS ankle monitor on him so you know

2    everywhere he goes.  You put him on house arrest where he --

3    if he's going to go somewhere, he has to get permission to

4    do it.

5          It also would allow for if the Court thinks it's

6    necessary for us to get therapy and some treatment which he

7    wouldn't able -- be able to do if he's in custody.

8          There are conditions that the Court could set.

9    And if he violations those conditions, then the Court can

10   revoke the bond.

11         Pretrial is good at their job, and they're

12   vigorous when it comes to these cases.  And they can make

13   sure that there -- that he is complying.  And he will

14   comply.  So there are conditions the Court can set.

15         THE COURT:  How do we address the internet signals

16   that come from neighbors?

17         MR. DOYLE:  How do we -- well, --

18         THE COURT:  Like how do we --

19         MR. DOYLE:  -- we can --

20         THE COURT:  -- prevent someone from getting on a

21   neighbor's internet?

22         MR. DOYLE:  Pretrial can make sure that he doesn't

23   have access, number one.

24         THE COURT:  How?  I mean, if I'm in my house, I

25   can see the internet signals --

1          MR. DOYLE:  Well, you can --

2          THE COURT:  -- from the people around me.

3          MR. DOYLE:  You can get --

4          THE COURT:  Other than making sure there are zero

5    devices in the house --

6          MR. DOYLE:  Right.

7          THE COURT:  -- belonging to anybody.

8          MR. DOYLE:  They can -- that's one way to do it.

9    Another way to do it is you can get your device and have a

10   device and see if you can pick up a neighbor's one.  It's

11   going to be secured.  If it's not secured, --

12         THE COURT:  Maybe it is, maybe it isn't.

13         MR. DOYLE:  -- they can determine that.  Or just

14   say no devices.

15         THE COURT:  All right.

16         MR. DOYLE:  Whatever --

17         MR. BATARSE:  Your Honor, --

18         MR. DOYLE:  -- conditions makes the Court feel

19   comfortable we're willing to abide by.

20         THE COURT:  All right.  Thank you, Mr. Doyle.

21         Yes, Mr. Batarse.

22         MR. BATARSE:  And just -- I apologize, Your Honor,

23   just briefly respond.  I think it is also important for the

24   Court to consider the obstruction that the Defendant engaged

25   in when the warrant was executed.  He was uncooperative.

1  Yes, his family is cooperative but he is not.

2           And then in addition, the questions that you're

3  asking defense counsel, it doesn't prevent somebody known to

4  the Defendant bringing him a device to his home.  There's

5  really no reasonable way of preventing him if he wants

6  access, which he does, to the internet from getting it.

7           MR. DOYLE:  Judge, for what it's worth, --

8           THE COURT:  I've heard enough.

9           MR. DOYLE:  Okay.

10          THE COURT:  All right.  I would like the parents

11 to come forward, Mr. Venegas to come forward because I'm

12 going to be giving you some really important information

13 that you have got to understand.

14          All right, first my findings.  I do find that the

15 presumption has been rebutted.

16          At this time I believe there are conditions of

17 release that I can impose.  They're going to be draconian in

18 this -- for this day and age.  You're not going to have

19 internet.  You're not going to have access to the internet.

20 We have to eliminate his internet access in your home.

21          But I do think that I can impose conditions that

22 reasonably assure the safety of the community and the type

23 of people who have been victimized by the conduct.

24          And let me just say, the conduct that is alleged

25 against you is reprehensible.  And letting you out on

1   conditions of release requires me to believe that you are

2   going to follow them.  Because if you don't follow them,

3   there are no conditions that I can set that can reasonably

4   protect people from your conduct.

5          You are innocent until proven guilty.  But I've

6   heard a lot of evidence.  There's a lot of electronic

7   evidence.  And it is very disturbing.

8          If at any time your supervising officer learns

9   that you are not complying with every single condition, if

10  you access the internet, if you get access to a telephone,

11  if you access a computer, I'm going to get a report, you're

12  going to be standing in front of me, and I can promise you

13  there will not be a second opportunity to make me believe

14  that you're going to comply with the conditions of release.

15  Do you understand that?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  All right.  These are the conditions

18  I'm going to require for your release.

19          First of all, there's going to be a $100,000

20  unsecured bond that your parents are going to have to sign

21  on as sureties, which means if you violate the conditions,

22  the bond can be revoked, the United States can seek a money

23  judgment against you and your parents for a hundred thousand

24  dollars.  Do you understand that?

25          THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Do you understand that if you sign on

2   as co-sureties, you are responsible for the $100,000 in the

3   event that the bond is forfeited?

4          MS. VENEGAS:  Yes, ma'am.

5          MR. ARMANDO VENEGAS:  Yes, Your Honor.

6          THE COURT:  You're going to be supervised by

7   Pretrial Services.  You will have to seek fulltime

8   verifiable employment that -- I mean, do you have to have

9   the internet -- do you physically work in an office?

10          THE DEFENDANT:  Yes, ma'am, yes, Your Honor.

11          THE COURT:  Do you have to have internet access to

12   do your job?

13          THE DEFENDANT:  For certain parts of the job, no,

14   Your Honor.

15          THE COURT:  Well, when you go to your office and

16   you're working in your office, I assume you're on some sort

17   of network that belongs to the company.

18          THE DEFENDANT:  Yes, just to save Excel files and

19   -- mainly just to save Excel files.  Entering data does not

20   require an internet connection.  It can always be saved

21   offline.

22          THE COURT:  All right.  We're going to come back

23   to the work issue because I don't know that we can install

24   the kind of software monitoring programs that we install on

25   someone -- I don't think we can.

1          U.S. PRETRIAL OFFICER:  I don't know --

2          THE COURT:  Yeah, all right, so I think he's going

3   to have to get another job.

4          MR. DOYLE:  This has been made public so we

5   anticipate they may terminate him.

6          THE COURT:  Okay.  All right.  So you'll have to

7   get fulltime verifiable employment.  You may not have

8   employment that requires you to use a computer or access the

9   internet, all right?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  You cannot obtain any passport.  This

12  report says you don't have one.  If you do have a passport,

13  you need to turn it in.

14         You -- I'm going to have you on home detention,

15  which means you are inside your house unless you're meeting

16  with your lawyer, going to the doctor, going to work, going

17  to church, or for some sort of mental health counseling or

18  treatment.  Do you understand that?

19         THE DEFENDANT:  I have a question.  Does the

20  backyard count as --

21         THE COURT:  That's your home.

22         THE DEFENDANT:  -- in the house?

23         THE COURT:  That's still your home, yes.  You're

24  going to be on an active GPS monitoring, meaning your

25  supervising officer will know where you are at all times.

1          I'm going to require you to undergo an evaluation

2    to determine whether or not you would benefit from

3    treatment, specifically sex offender treatment.  If they

4    decide that you would benefit from that, you must comply and

5    undergo that evaluation and treatment.

6          To the extent you receive those services, you may

7    be required to pay for them, depending on your ability to

8    pay.

9          You have to avoid all contact with any

10   codefendant, victim, or potential victim or witness.

11         You may not have or be in the vicinity of a

12   firearm, destructive device, or other dangerous weapon.  So

13   the weapon that belongs to your other son has to be removed

14   from the home before Mr. Venegas returns.

15         MS. VENEGAS:  Yes, ma'am.

16         THE COURT:  You shouldn't have any contact with

17   law enforcement because you should only be in your home.

18   But to the extent you have any contact with law enforcement,

19   it has to be reported within 72 hours.

20         Trust me, if you don't report it, your supervising

21   officer's still going to find out about it and then you're

22   going to be here in front of me on a bond violation.

23         THE DEFENDANT:  Is that reported through my

24   attorney or through myself?

25         THE COURT:  Sorry?

1          THE DEFENDANT:  Whenever if I come into contact

2    with any law enforcement, is that reported by myself or my

3    attorney?

4          THE COURT:  By you.  These -- this is your

5    responsibility.  You report it to your supervising officer.

6          I've told you that you will incur the cost

7    associated with any treatment based on your ability to pay.

8          You cannot have any contact with minors.  Don't

9    volunteer or -- this isn't even necessary because you are

10   going to be at home.  But no volunteering in organizations

11   or activities involving minors.

12         Don't frequent or loiter places within a hundred

13   feet of minors, which again is not going to be possible

14   because you are going to be in your home.

15         Let's talk about the computers.  All right.  You

16   may not have a computer, a cellphone that can access the

17   internet, an iPad.  Any type of electronic device that could

18   access the internet, you may not have at all.  Understood?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Within the house, I read about a lot

21   of different electronic devices.  Can you all get rid of the

22   electronic devices that are in your home?

23         MR. ARMANDO VENEGAS:  Yes, ma'am.

24         MS. VENEGAS:  Yes, ma'am.

25         THE COURT:  All right.  Let's do that.  I think

1   that's the most -- that's the best option for making sure

2   that there's no ability to access the internet.

3            So if someone gives you a cellphone, you cannot

4   take it.  Someone -- your brother lets you use a cellphone

5   because he comes home for a visit, you may not touch it.  No

6   electronic devices whatsoever.  Understood?

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  And all the gaming consoles have been

9   seized already.

10           MS. VENEGAS:  Yes, ma'am.

11           MR. ARMANDO VENEGAS:  Yes, ma'am.

12           THE COURT:  Goes without saying, no social media

13  because you have no access to the internet, no access to any

14  electronic device, understood?

15           THE DEFENDANT:  Yes, Your Honor.

16           THE COURT:  Do not possess or peruse any type of

17  sexually explicit material or any material that could be

18  called child pornography.

19           If you are convicted of a sex-related offense, you

20  will have to comply with all State laws regarding sex

21  offender registration.

22           You may not violate any Federal, State, or local

23  law while on conditions of release.

24           You must report any change -- well, you're not

25  going to have a phone number so that's not necessary.

1          If for some reason there's a change in your

2   address, it has to be reported in writing in advance to his

3   supervising officer.

4          MS. VENEGAS:  Yes, ma'am.

5          THE COURT:  He's on home detention.  He's only

6   allowed to be in your home, to visit with his lawyer, to

7   come to court, to go to church.  And if he gets a job where

8   he doesn't use a computer he can go to work.  That's it.

9          MS. VENEGAS:  Yes, ma'am.

10          MR. ARMANDO VENEGAS:  Yes, ma'am.

11          THE COURT:  All right.  They're really serious --

12   do you understand all the conditions I've given you?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  Oh, also you have -- part of your

15   conditions are that you must appear for all of your court

16   appearances.  If you are convicted, you must surrender to

17   serve your sentence.

18          If you fail to do that, if you are convicted, if

19   you fail to surrender to serve or if you fail to appear for

20   your court appearances, the bond could be revoked.

21          And I'm about to explain to you all the other

22   consequences that are available if you fail to comply with

23   these conditions.

24          And if you are found not guilty, the bond will be

25   released.  If you are convicted and you surrender to serve a

1   sentence, the bond will be released, and then your parents

2   will no longer be liable for the hundred thousand dollar

3   bond.

4            Does this offense qualify for DNA collection?

5            MR. BATARSE:  Yes, Your Honor.

6            THE COURT:  All right.  You're also -- as part of

7   your conditions of release is you must cooperate with the

8   collection of a DNA sample.  That will be maintained by law

9   enforcement.  Do you understand that?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  All right.  There are very serious

12  consequences for failing to comply with all of the

13  conditions of release.  I want to make sure you understand

14  all the consequences.

15           If you violate any of the conditions, I can issue

16  a warrant for your arrest.  Your pretrial release can be

17  revoked and you can be held in custody until the time of

18  your trial.  You could be prosecuted for contempt of court,

19  imprisoned, fined, or both.

20           And I'm going to explain more to you the type of

21  prison sentences you can get just for doing things you're

22  not supposed to do on release.

23           As I mentioned, the bond will be forfeited, the

24  total amount of the bond is due and owing, and the United

25  States can obtain a judgment against you and your family or

1  seize property or security belonging to you or your family

2  to satisfy the judgment.

3          It is a crime punishable by an additional ten

4  years in prison and a fine of up to $250,000, or both, to

5  obstruct a criminal investigation, to attempt to influence

6  or tamper with a witness, informant, or victim.  That's why

7  you may not have any contact with anyone that could be

8  associated with this case.  Do you understand that?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  If you commit a crime while on

11  release, the punishment can be more severe than it would be

12  if you committed the same crime while not on release.

13         If you commit a felony offense while on conditions

14  of release, you can receive an additional term of

15  imprisonment for up to ten years, an additional fine of up

16  to $250,000.  And that additional prison time does not begin

17  to run until after your underlying sentence is complete.  Do

18  you understand that?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  If you fail to appear in court when

21  required, or if you are convicted and you fail to surrender

22  to serve a sentence, you can be assessed additional term of

23  imprisonment of up to ten years which, again, does not begin

24  to run until the underlying sentence is complete, an

25  additional fine of up to $250,000.

1    I've talked to you about the forfeiture of the

2  bond.  I've talked to you about the release of the bond.  If

3  you are found not guilty or if you are convicted and you

4  surrender to serve your sentence, the bond will be released

5  as against you and your parents.

6    Do you fully understand all of the consequences

7  for failing to comply?

8    THE DEFENDANT:  Yes, Your Honor.

9    THE COURT:  And, most importantly, what will

10  happen if you fail to comply with any of these conditions is

11  that your pretrial officer will submit a report to take

12  action on your conditions of pretrial release.  You're going

13  to have to appear in front of me.  And that's not going to

14  be a good situation.

15    THE DEFENDANT:  Yes, Your Honor.

16    THE COURT:  All right.  Is there anything from

17  Pretrial that I need to cover?

18    U.S. PRETRIAL OFFICER:  The only thing I know you

19  wanted home detention and complying with home, but any

20  travel like to Harris County or surrounding counties?

21    THE COURT:  Do you live in Montgomery County?

22    MS. VENEGAS:  Yes, ma'am.

23    MR. ARMANDO VENEGAS:  Yes, ma'am.

24    THE COURT:  Montgomery and Harris only.  And,

25  again, only for lawyer visits, work, medical treatment, and

1  mental health counseling or psychological counseling.  All

2  right.

3          MR. ARMANDO VENEGAS:  I have a question, ma'am.

4          THE COURT:  Yes.

5          MR. ARMANDO VENEGAS:  About having the treatment

6  inside the house --

7          MR. DOYLE:  We'll work --

8          THE COURT:  Yeah, if -- I mean, --

9          MR. DOYLE:  We'll work on this stuff out --

10          THE COURT:  Yes.  I'm just saying he can't go

11  anywhere that's not in Montgomery County or Harris County,

12  and the only reason he can leave your home are the things I

13  mentioned.

14          MS. VENEGAS:  Yes, ma'am.

15          THE COURT:  Otherwise he is in that house with no

16  internet access, no devices, no ability to get on the

17  internet, no ability to contact anyone over the internet,

18  nothing.

19          MS. VENEGAS:  Yes, ma'am.

20          THE COURT:  Understood?

21          MS. VENEGAS:  Yes.

22          THE COURT:  And I should have mentioned this,

23  Pretrial Services has the ability to come in, go through

24  your home, announced, unannounced, and inspect everything to

25  make sure there are no devices.  Do you understand that?

 1         MS. VENEGAS:  Yes, ma'am.

 2         MR. ARMANDO VENEGAS:  Yes, ma'am.

 3         THE COURT:  Anything else?

 4         MR. BATARSE:  Your Honor, the United States would

 5  respectfully request a 24-hour stay to appeal the Court's

 6  decision on detention.

 7         THE COURT:  Well you're going to have to appeal it

 8  to the miscellaneous judge, I guess.

 9         MR. BATARSE:  Yes, Your Honor.

10         THE CLERK:  Judge Tipton.

11         THE COURT:  All right.

12         MR. BATARSE:  Who is it?

13         THE CLERK:  Judge Tipton.

14         THE COURT:  Judge Tipton.

15         MR. BATARSE:  Yes, Your Honor.

16         THE COURT:  What's today, Tuesday?

17         MR. BATARSE:  Today's Tuesday the 18th, Your

18  Honor.

19         THE COURT:  All right.  So the United States is

20  asking for 24-hour stay.  I'm going to grant it because

21  obviously there's a lot of things that would have to be done

22  anyway so before he could return home.  So they're going to

23  appeal my decision to the miscellaneous judge.  The

24  miscellaneous judge will either accept, reject, or revise

25  the conditions.

TANISHA CAMPBELL - REDIRECT BY MR. BATARSE                74

1        Anything else?

2            MR. BATARSE:  No, Your Honor.

3            THE COURT:  All right.  Anything else?

4            MR. DOYLE:  No, Your Honor.

5            THE COURT:  I don't think we need to execute the

6    bond paperwork until we find out if --

7        (Judge/Clerk confer.)

8            THE COURT:  So, Mr. and Mrs. Venegas, you'll sign

9    the bond paperwork here today.  Mr. Venegas, your son is

10   going to remain in custody until this is reviewed by the

11   miscellaneous judge.  And, depending on that review, he may

12   or may not be released on the conditions that I have set out

13   today.

14           MR. ARMANDO VENEGAS:  Understood.

15           THE COURT:  All right.

16           MS. VENEGAS:  Thank you, ma'am.

17           THE COURT:  All right.  Anything else?

18           MR. DOYLE:  No, Your Honor.

19           THE COURT:  All right.  You're all excused.  Thank

20   you.

21           MR. BATARSE:  Yes, Your Honor.

22       (Proceedings adjourned at 11:28 a.m.)

23

24

25                          *  *  *  *  *

1          *I certify that the foregoing is a correct*

2     *transcript to the best of my ability produced from the*

3     *electronic sound recording of the proceedings in the above-*

4     *entitled matter.*

5     */S/ MARY D. HENRY*

6     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9     *JTT TRANSCRIPT #67484*

10    *DATE FILED:  JULY 20, 2023*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25